IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MICHELLE L. GILBERT, | ) | CIVIL ACTION NO. 04-0695 |
| | ) | |
| Plaintiff, | ) | Judge Conti |
| | ) | Magistrate Judge Caiazza |
| v. | ) | |
| | ) | |
| FRATERNAL ORDER OF EAGLES | ) | |
| AERIE NUMBER 983 OF | ) | |
| BROOKVILLE, PENNSYLVANIA. | ) | |
| | ) | |
| | ) | |

**REPORT AND RECOMMENDATION**

I. **RECOMMENDATION**

Michelle Gilbert("Gilbert") alleges that her employer, the Fraternal Order of Eagles ("FOE"or "the club") discriminated against her on the basis of sex by creating a hostile work environment in violation of Title VII, 42 U.S.C. § 2000e *et seq.* She also claims that the FOE violated Title VII when it terminated her employment in retaliation for her complaints of sexual harassment. Gilbert makes similar claims under the Pennsylvania Human Relations Act("PHRA"), 43 Pa. Cons. Stat. Ann. § 951 *et seq.* Following the completion of discovery, the FOE filed a motion for summary judgment (Doc. 16), and Gilbert filed a motion for partial summary judgment (Doc. 33)[1] It is

---

[1]   Gilbert claims that she is entitled to summary judgment with respect to the FOE's status as an employer for purposes of Title VII. The FOE claims the same entitlement, arguing that it is <u>not</u> an employer covered by Title VII.  In its discussion of the FOE's motion, the court concludes that outstanding material issues of fact preclude summary judgment on this issue. This conclusion is reinforced by the arguments made in Gilbert's motion. Because the court's position is explained in detail in the context of the FOE's motion, it will not

respectfully recommended that both of these motions be denied.

## II. BACKGROUND

In August 1999, Gilbert began work as a bartender at the Brookville "aerie" of the FOE, a charitable and social organization with membership open to local men. For nearly three years she did not encounter any significant problems in her job. Although she and the other bartenders were sometimes criticized for slow service or for tying up the phone, Gilbert received uniformly positive performance reviews and regular raises.  Prior to June 1992 she had a good working relationship with the three FOE trustees. These trustees, among other things, hired, fired, disciplined, and paid the employees. The trustees were elected to staggered three year terms.

In early June 2002, Todd Furman was elected to serve as a club trustee with David Wonderling and Lloyd Page. Gilbert alleges that immediately after Furman was elected, he made it difficult and uncomfortable for her to perform her duties by launching a campaign of sexual harassment, making her the primary target. Gilbert states that Furman regularly made sexual advances, vulgar comments, inappropriate suggestions and remarks, and engaged in offensive touching. In her complaint and deposition testimony, Gilbert quotes a number of Furman's statements, some made several times, and others made hundreds of times over a three to four month period:

---

discuss Gilbert's arguments separately.

- "Can you put that over there again?  I want to see your ass."

- "Let's go for a ride after work . . . a mustache ride."

- When Gilbert commented that Furman's conduct could cost him his position as trustee, he responded, "It's not my position I'm thinking of, it's the position <u>we</u> could have."

- "I could eat <u>you</u> for breakfast every day."

- When Gilbert had to bend down during the course of her work, Furman said, "While you're down there, how about doing a guy a favor?"

- "I'll give you something to wrap your tongue around."

- "How'd you like to feel this soft beard between your thighs?"

- "I could give you the best mustache ride ever."

- "You don't know what you're missing."

Gilbert alleges that Furman's verbal abuse was compounded when he waited for her outside the club one night, asked her to get in his van, and tried to kiss her. (Gilbert Dep. 182-83). On another occasion, he smacked her buttocks, telling her,"I'll take care of you. You just take care of me." <u>Id.</u> at 186.

In her complaint, Gilbert alleges that she repeatedly told Furman that his conduct and remarks were offensive and asked him to stop. He did not. The day after Gilbert refused his advances, he told her not to tell anyone what had happened the night before, or she would lose her job. <u>Id.</u> He also told her "to remember who does [the bartenders'] schedule." <u>Id.</u> at 140-41. Gilbert thought that she was being set up to lose her job. <u>Id.</u> at 186. Twice during the summer of 2002 Gilbert complained to

-3-

trustee Wonderling about Furman's behavior.[2]  Id. at 144-45. Late in August, Gilbert telephoned Wonderling and Page concerning Furman's conduct and was told to put her complaints in writing. She delivered the written complaints to Wonderling and Page the next day, August 22, 2002.

That day, Wonderling and Page met with Furman, asked him to resign his trusteeship, and imposed a ninety day club suspension. Furman agreed to the suspension, but denied making many of the comments recorded in Gilbert's statement. Richard Gadley assumed Furman's position as a trustee. (Wonderling Dep. Ex. 3). In the weeks following Furman's resignation, Gilbert thought that the trustees were cold and unfriendly. One of the FOE officers told her that she wouldn't be working at the club much longer.(Gilbert Dep. 54-55).

A little more than a month after receiving her written complaints about Furman, the FOE severed its relationship with Gilbert. According to the club, Gilbert's termination was the result of events that occurred on her penultimate day of work, September 29, 2002. Shortly after arriving for the night shift, Gilbert told trustee Gadley that she felt sick, and received permission to return home. Later that night, the FOE president, Mike Flat, drove by Gilbert's home, and observed that her car was not in the driveway. (Page Dep. 93-95). The same evening, Gadley

---

[2] The deposition testimony of another female bartender at the FOE, Cheryl Wright, indicates that she complained to Wonderling about Furman's inappropriate sexual comments as early as mid-June 2002. (Wright Dep. 21).

called Gilbert's home and talked to a woman who identified herself as the babysitter. She reported that Gilbert was at work. (Gadley Dep. 43-47). Gadley immediately called the other trustees to "let them know that [he] intended to terminate [Gilbert]." Id. at 47.

The trustees agreed that Gilbert would be terminated for lying. (Gadley Dep. 57). When she reported to work on October 5, 2002, the trustees informed her that she was being "let go," and asked her to surrender her keys. (Wonderling Dep. Ex. 6). Although she asked repeatedly why she was being terminated, the trustees told here her that they "were not going to give a reason why at this time." Id.

Soon thereafter Gilbert filed a complaint with the Pennsylvania Human Relations Commission ("PHRC") which was cross-filed with the Equal Employment Opportunity Commission ("EEOC"). After receiving a notice of right to sue, Gilbert filed this action. The FOE's motion for summary judgment is pending.

### III. THE GROUNDS ASSERTED IN SUPPORT OF THE FOE'S MOTION FOR SUMMARY JUDGMENT

In support of its motion for summary judgment, the FOE first contends that Gilbert's Title VII claims and the supplemental state claims should be dismissed because the FOE was not an "employer" within the meaning of that Act. In the alternative, the FOE argues that if it is found to have been an "employer" subject to Title VII, it is entitled to summary judgment on the discrimination claims because "it exercised reasonable care to

prevent and promptly correct any harassing behavior."(Mot. for Summ. J.¶ 4). Finally, the FOE asks that the court grant its motion for summary judgment as to the retaliatory discharge claiming that "the [FOE] had legitimate business reasons for terminating [Gilbert]'s employment." Id. at ¶ 5.

A. **The FOE's Status as an Employer for Purposes of Title VII**

Gilbert's complaint was filed in this court a year and seven months ago. Administrative proceedings with the EEOC and PHRC began nearly three years ago. The FOE now contends, for the first time, that it is not an "employer" for purposes of Title VII. This issue was evident to the FOE when the complaint was filed, and should have been addressed in administrative proceedings, the FOE's answer, in a motion to dismiss, or in more extensive discovery. Because the scope of Title VII coverage lies at the heart of this suit and cannot be evaluated without reference to the record, the court must now address the FOE's exemption argument.[3]

---

[3] In Nesbit v. Gears Unlimited, Inc., 347 F.3d 72,79 (3d Cir. 2000), cert. denied, 541 U.S. 959 (2004), the Court of Appeals for the Third Circuit aligned with its sister courts in the Second, Seventh, Eleventh, and District of Columbia Circuits, holding that Title VII's fifteen employee minimum is not jurisdictional, but is instead a substantive element of a Title VII claim, see Morrison v. Amway Corp., 323 F.3d 920 (11th Cir 2003); DaSilva v, Kinsho Int'l Corp., 229 F.3d 358 (2d Cir. 2000); EEOC v. St. Francis Xavier Parochial School, 117 F.3d 621, 623-25 (D.C. Cir. 1997); Johnson v. Apna Ghar, Inc., 330 F.3d 999, 1001-02 (7th Cir. 1993). Courts of Appeals in the Fourth, Fifth, Sixth, Eighth, Ninth, and Tenth Circuits have reached the opposite conclusion, holding that the Title VII numerosity requirement is jurisdictional, see Arbaugh v. Y & H Corp., 380 F.3d 219 (5th Cir. 2004 ), cert. granted, 125 S.Ct. 2246 (U.S. May 16, 2005); Hukill v. Auto Care, Inc., 192 F.3d  437, 441-42 (4th Cir. 1999); Scarfo v.

Despite the fact that the FOE had an abundance of time to prepare the request for summary judgment based on its Title VII status, it fails to address discrepancies in the record, and misapplies the case law detailing the formula to be used in calculating the number of employees for purposes of Title VII.

Gilbert testified at her deposition that the FOE had more than fifteen employees during the relevant years. (Gilbert Dep. 23). Trustee Dolby offered similar testimony[4] and prepared a chart purporting to show, for 2001 and 2002, each employee who worked at the FOE, whether the employee was paid in cash or by check, and the approximate number of weeks the employee worked during each year. According to this chart, in each relevant year the FOE had more than fifteen employees. (Dolby Aff. Ex. B).

The FOE counters this evidence with charts of its own, created by and attached to the affidavit of FOE secretary Phil Cook. According to the FOE, this chart "graphically identifies, on a weekly basis, every full time employee whom [the FOE] employed in any part of every workweek [sic] during the [years at-issue]. . . ." ( FOE Br. 4). The FOE relies on Cook's affidavit and attached charts to establish that "the most employees Defendant employed in even one workweek [sic] during

---

Ginsberg, 175 F.3d 957, 960 (11th Cir. 1999); Childs v. Local 18, Int'l Bhd. Of Elec. Workers, 719 F.2d 1379, 1382 (9th Cir. 1983); Armbruster v. Quinn, 711 F.2d 1332, 1335 (6th Cir. 1983); Owens v. Rush, 636 F.2d 283, 287 (10th Cir. 1980). Presumably, the Supreme Court's decision in Arbaugh will resolve the conflict among the circuits. In the meantime, this court is bound to follow the rule announced in Nesbit.

4   Dolby is Gilbert's brother.

the subject period was eight employees," and it certainly did not have "fifteen or more employees for each working day in each of twenty or more calendar weeks." Id. (emphasis in original).

These charts do not help the FOE because they disregard completely the Supreme Court's instructions for determining an employer's status for purposes of Title VII. In Walters v. Metro. Educ. Enter. Inc., 519 U.S. 202, 206 (1997), the Supreme Court directed that the number of employees be calculated using the "payroll method." The Court wrote:

> The test for when an employer "has" an employee is no different from the test for when an individual *is* an employee: whether the employer had a relationship with the individual on the day in question. This test is usually called the "payroll method" since the employment relationship is most readily demonstrated by the individual's appearance on the employer's payroll.

Id. Under this test, part-time workers are employees. A person who is not compensated for one or more days in a given week is an employee. A person who works only one hour in a week is an employee. A person is an employee for purposes of Title VII continuously from the moment she is hired to the moment she departs. Walters, at 211.  The FOE's graphs, which count only full-time employees, were not compiled using the payroll method and do not support the FOE's entitlement to summary judgment.[5]

The record also contains what purports to be the FOE's full list of employees for 2001 and 2002.(Ans. to Second Set of

---

[5] Charts prepared by Dolby on Gilbert's behalf are also flawed because they are based on an approximation of the number of weeks worked by each employee listed.

Interrogs. Ex. 2). The court, however, cannot ascertain whether the list is complete. For example, Gilbert alleges that some personnel were paid "under the table," and may not have been included in the FOE's official employment records. Given the uncertainties in the record, the court is unable to determine whether the FOE is an employer within the scope of Title VII; the number of FOE employees in the relevant years is a material question of fact. The FOE's motion for summary judgment on all claims asserted in Counts I and II of the complaint should be denied.

### B. **The FOE's Entitlement to the Ellerth/Faragher Defense**

In order to prevail in a Title VII action alleging a hostile work environment, Gilbert must make a prima facie showing that: (1) she was the victim of intentional discrimination based on gender; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected her; (4) the discrimination would have been detrimental to a reasonable person of the same sex in the same position; and (5) the employer was responsible for the discrimination under the theory of respondeat superior. Strauser v.Fulkroad & Sons, Inc., No.403-CV-2017, 2005 WL 2020636,(M.D. Pa. July 28, 2005). Where a plaintiff is able to establish a prima facie case but did not suffer a "tangible employment action,"[6] the defendant may raise what is known as the

---

[6] For purposes of summary judgment only, Gilbert concedes that Furman did not subject her to adverse employment action. The FOE does not allege that Gilbert failed to establish any other element of her prima facie case.

Ellerth/Faragher defense. This defense is available where the defendant demonstrates, by a preponderance of the evidence, that it used reasonable care to prevent and correct the harassment, <u>and</u> that the plaintiff failed unreasonably to avail herself of those procedures or to avoid other harm. <u>Burlington Indus., Inc. v. Ellerth</u>, 524 U.S. 742 (1998), and <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775 (1998). The FOE asserts that it is has satisfied these criteria, and is entitled to summary judgment on the Title VII hostile environment claim. The court disagrees.

The starting point in any evaluation of the <u>Ellerth-Faragher</u> defense is whether an employer took reasonable steps to prevent and correct sexual harassment. Admitting that it did not have a formal sexual harassment policy, the FOE states correctly that a formal policy is not an rigid requirement where the employer is a small enterprise. If an employer can show that it took other reasonable precautions to avoid and remedy sexual discrimination and had in place a sensible complaint procedure, it may satisfy the first prong of the <u>Ellerth-Faragher</u> defense. <u>Faragher</u>, 524 U.S. at 805.

According to the FOE, its "House Rules" provided a reasonable and effective substitute for a formal policy. (FOE App. Tab 3). These rules prohibit "[p]rofane or obscene language, boisterous talk, [and] indecent or improper conduct in the [club's] Social and Buffet Rooms," and are enforced by "a system of writing up members whose conduct does not conform with the House Rules." (FOE Br. 8). The rules do not mention sexual

-10-

harassment or employment discrimination in general. There is no procedure for reporting sexual harassment on the part of an employer or a co-worker. Although the rules do prohibit foul language and some related behavior, the prohibition applies to members, not to employees or supervisors, and is in force in only two rooms of the club. Members, not employees, may complain about rule infractions and employees may "write up" members, but not other employees. Because women cannot be members of the FOE, they cannot complain about rule violations and do not have any meaningful recourse for inappropriate conduct on the part of a supervisor or a co-worker.

The FOE has not cited a single case where a "policy" resembling the FOE House Rules was found sufficient to warrant summary judgment. In the one case which it does reference, Koerber v. Journey's End, No. 99 C 1822, 2004 WL 723850 (N.D. Ill. March 31, 2004), the District Court found that the procedures adopted by an employer were inadequate to establish the first prong of the Ellerth/Faragher defense, even though the employer posted, over the water cooler, an EEOC poster summarizing employee rights, installed a video recording system to monitor the employee annex, had an open-door policy to report problems, and made a zero tolerance agreement with the alleged harasser. The court concluded that these measures did not constitute an acceptable informal policy because the EEOC poster provided only a general summary of workplace rights; the video system monitored only one area, and the alleged harasser know how

-11-

to turn it on and off; the open- door policy was not in writing, posted, or otherwise communicated to employees; and the zero tolerance agreement was not enforced after additional complaints were received.

The FOE House Rules are full of gaps and afford club employees even less protection than the procedures described in Koerber. Accordingly, the court finds that the FOE has failed to demonstrate that it took reasonable and sensible action to avoid and remedy sexual harassment. The Ellerth/Faragher defense is, therefore, unavailable to the club.

### C. The Retaliation Claim

In order to prevail on a retaliation claim under Title VII, a plaintiff must establish three elements: (1) participation in protected activity;(2) an adverse employment action after or contemporaneous with participation in the protected activity; and (3) a causal connection between the protected activity and the adverse employment action. Woodson v. Scott Paper Co., 109 F.3d 913,920 (3d Cir. 1997). If an employee succeeds in establishing a prima facie case of retaliation, the relatively light burden shifts to the employer to show a legitimate non-retaliatory basis for the adverse employment action. If the employer is able to articulate a legitimate basis for its action, the plaintiff must then show that the reason proffered is false, and that retaliation motivated the employment action. Krouse v. Am. Sterilizer, 126 F.3d 494, 501-02 (3d Cir. 1997).

The FOE alleges that Gilbert "cannot prove that her

protected activity caused her eventual termination." (FOE Br. 14). "[T]he record shows that [Gilbert's] discharge was not discriminatory, but rather was the direct result of her lying to Trustee Gadley." Id.

In order to establish causation for purposes of a retaliation claim, a plaintiff may rely on any category of evidence in the record as a whole. "Although timing and ongoing antagonism have often been the basis for the causal link, . . . case law clearly has allowed a plaintiff to substantiate a causal connection . . . through other types of evidence that support the inference." Farrell v. Planters Life Savers Co., 206 F.3d 271, 280-81 (3d Cir. 2000). The court finds that the record evidence in this case raises an inference of causation for purposes of Gilbert's retaliation claim. While the FOE contends that Gilbert was fired solely for being untruthful, the record suggests that the termination was based on something more problematic.

Gilbert testified that after she resisted Furman's advances and complained about his conduct, she was told more than once that her job was in jeopardy. She was "let go" on October 5, 2002, only five weeks after her complaints about Furman were committed to writing. After Gilbert left work on September 29, 2002, stating that she felt sick, the FOE President, Mike Flat, decided to drive by her house to see if her car was in the driveway.(Gadley Dep. 94). The record does not reflect that a club officer had ever before driven by the house of an employee who called off because of sickness or for any other reason.

-13-

Later that night, trustee Gadley called Gilbert to determine whether she returned home. Id. at 37-54.

Based on the evening's events, Gadley concluded and told the other trustees that Gilbert had lied to him. They decided that night to terminate her without further investigation, and without talking to her. Gadley didn't think that it was "his business" to ask Gilbert to explain her version of the events. Id. On October 5,2000, Gilbert was summarily terminated when she reported to work. The graduated discipline policy presented to and signed by Gilbert earlier in her employment was not utilized. (Wonderling Dep. Ex. 4). The trustees refused to explain the reason for the termination, even though two of them admitted later that they should have done so. Id. at 33-34; (Gadley Dep. 62). Minutes of a trustee meeting held October 15, 2002 state that Gilbert was fired because "it was in the best interests of the club." Id. at Ex. 8.

The record establishes that there is an outstanding material question of fact as to whether Gilbert's termination was effected for a legitimate business reason. Consequently, the FOE's motion for summary judgment with respect to the retaliation claims should be denied.

## V. CONCLUSION

Because material questions of fact exist with respect to each of the grounds asserted in support of both parties' motions for summary judgment, those motions should be denied in their

entirety.

In accordance with the Magistrate's Act, 29 U.S.C. §(b)(1)(B), 636 (b)(1)(b) and (c), and Rule 72.1.4 (B) of the Local Rules for Magistrates, objections to this Report and Recommendation are due by December 5, 2005. Responses to objections are due by December 15, 2005.

November 18, 2005

S/ Francis X. Caiazza
Francis X. Caiazza
U.S. Magistrate Judge

cc:
James W. Carroll, Jr., Esq.
Cami L. Davis, Esq.
Rothman Gordon, P.C.
Third Floor, Grant Building
Pittsburgh, PA 15219


James G. Seaman, Esq.
Christina I. Kepplinger, Esq.
Eckert Seamans Cherin & Mellott, LLC
U.S. Steel Tower
600 Grant Street, 44th Floor
Pittsburgh, PA 15219